IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEPHEN J. BECKER,

                  Plaintiff,              Case No. 3:10 CV 2487

      -vs-

                                               <u>MEMORANDUM OPINION</u>

ELMWOOD LOCAL SCHOOL DISTRICT,

                  Defendant.

KATZ, J.

This matter involves Plaintiff Stephen Becker's ("Plaintiff," or "Becker") claims against Defendant Elmwood Local School District ("Elmwood," or "Defendant") alleging gender discrimination, disability discrimination, and retaliation in violation of both federal and Ohio law. The matter is currently before the Court on Elmwood's motion for summary judgment.  (Doc. 32). For the reasons stated herein, Elmwood's motion is granted.

**I.  Background**

Becker began his employment with Defendant as an Elmwood Elementary School fourth grade teacher at the start of the 2001-2002 school year.  From 2001-2006, Becker generally received positive teaching evaluations, and Becker described his employment to that point as "wonderful."  Near the end of the 2008-2009 school year, however, Elmwood's Superintendent, Steve Pritts, and the Elmwood Elementary Principal, Michele Tuite, informed Becker that they recommended that the School Board not renew Becker's contract.  Becker subsequently resigned and thereafter instituted this action.

The parties agree that the events leading to Becker's resignation did not begin until the 2006-2007 school year, though they differ on exactly when the problems started.  Becker suggests that "things began to turn" in August 2006 when Tuite became the elementary school principal.

(Doc. 43 at 5).  Becker allegedly told Tuite in the fall of 2006 that he has obsessive compulsive disorder ("OCD"), though Becker does not point to any specific problems with Tuite until later in the year.

Elmwood suggests Becker's problems began while he was coaching the Elmwood Middle School girls' basketball team in early 2007.  Specifically, the Elmwood Middle School Principal, Jesse Steiner, who was responsible for supervising Becker in his capacity as a basketball coach, expressed concerns that "Becker had a 'negative and unprofessional' communication style with students," that "Becker's team lacked 'fundamental basketball skills,'" and that "Becker's player[s] were not 'having fun' because Becker 'threatened them with extensive running if they lose games.'" (Doc. 32 at 5; Doc. 32-8).  After several unsuccessful attempts at meeting with Becker, Steiner sent Becker a memorandum outlining his concerns, and stating that "[i]t is evident that your coaching is not where it was last year."  *Id*.  Becker concedes that Tuite was not involved in Steiner's assessment of Becker's coaching, but notes that Steiner asked Becker about his health in early 2007.  Moreover, Becker alleges that either Tuite or Pritts told Steiner that Becker should see a psychiatrist.  (Doc. 43 at 13; Doc 37 at 12-15).

Also in early 2007, Pritts called Becker's parents to request a meeting with them because "the school [was] concerned about [Becker's] well-being."  (Doc. 28 at 24:24-26:7).  Becker's parents declined Pritts' request, stating that they did not share Pritts' concerns.

In late Spring 2007, "Tuite began receiving complaints from other teachers that Becker was shouting at two students in the hallway so loudly that he could be heard at the other end of the building."  (Doc. 32 at 6).  Tuite subsequently held a conference between herself, Becker, and a union representative on May 9, 2007, during which she verbally reprimanded Becker for

2

unacceptable behavior with the students.  Additionally, Tuite stated that during the meeting Becker was "becoming physically agitated," and would repeatedly say "okay, okay, okay," and "may I leave now."  (Doc. 32 at 7).  After the meeting Becker returned to his classroom.  Tuite–out of concern for what might happen–began to follow Becker at a distance.  Becker, however, walked back to the office and, according to Tuite, "when [Becker] walked past me in the hallway his eyes stared right through me.  And at that point it appeared that he was no longer in a rational state of mind." (Doc. 39 at 75:25-76:3).  When Becker got back to the office, he allegedly told the school secretary, "[g]et me a sub, I'm out of here." (Doc. 32-3 at ¶6).  Becker then left the building.  Tuite promptly reported the events to Superintendent Pritts, who ordered a lockdown of the school and notified police.

Immediately prior to the "departure incident" of May 9, 2007, Pritts received a complaint from Elmwood Elementary's secretary, Michele Story, stating that Becker was repeatedly making unwanted telephone calls and leaving messages for her son, Luke, who graduated from Elmwood High School a year earlier in 2006.  Ms. Story played some of the messages for Pritts, who described them as follows:

> I cannot recall the exact amount but it was like 17 times in a matter of six, seven minutes.  And the conversation that I remember very specifically was his question to the phone owner, which was Luke, how could you do this to me?  And it was repeated over, how could you do this to me?  How could you do this to me?  And there was a lot of profanity involved in it, too.  I do recall that.

(Doc. 28 at 56:3-10).

An investigation by Pritts and the Elmwood School Board ultimately concluded that while Becker did have a friendly relationship with Luke, Becker did not engage in any inappropriate behavior during the time Luke was enrolled in the school district.  Despite the investigation's

eventual conclusion, however, the nature of Becker's conduct was not clear when Ms. Story initially lodged complaints of harassing phone calls.  Consequently, in consideration of the May 9 "departure incident," coupled with the School Board's intention to further investigate Becker's conduct as it related to Luke Story, Becker was put on paid administrative leave, effective May 10, 2007.

On June 26, 2007 Becker filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the United States Equal Employment Opportunity Commission ("EEOC").

On August 16, 2007, Pritts held a meeting with Becker, Tuite, Steiner, and a union representative to discuss Becker's return from administrative leave for the 2007-2008 school year. Notes from the meeting reflect that Becker was warned about his professionalism and demeanor, about the events of May 9, 2007, about verbal and mental abuse of his basketball team, and about harassing phone calls made to Michele and Luke Story.  The notes also reflect that Elmwood asked Becker "for information related to any physical and mental issues [he] may be experiencing that [Elmwood] could help [him] with."  (Doc. 39-10).  Morevoer, Elmwood "asked for a medical evaluation from a third party doctor because of their concerns [about appropriate boundaries, and about the safety and well being of students.]" *Id*.  Further, notes reflect that Pritts commented on Becker's OCRC complaint.  After the meeting, Becker was allowed to return for the 2007-2008 school year.

On September 13, 2007, Becker filed a second complaint with the OCRC and EEOC. Pritts showed Tuite the complaints early in the 2007-2008 school year, though it is unclear exactly when he did so.

4

In late September 2007, Becker sent a letter to Tuite requesting that he receive a "continuing contract" at the beginning of the 2008-2009 school year.  Noting concerns with Becker's teaching performance, and believing that a continuing tenured position to be premature, Tuite instead recommended a one year limited contract.  Both Pritts and the School Board agreed with Tuite's recommendation, and Becker was offered a one year limited contract for the 2008-2009 school year.

Tuite conducted two teaching evaluations of Becker during the 2007-2008 school year; one in October 2007, and one in February 2008.  Both evaluations produced mixed results and indicated "continuing concerns over [Becker's] lack of differentiated instructional techniques to reach students with different abilities and learning styles, with the lack of classroom rules and expectations, and with Becker's often demoralizing tone and condescending techniques."  (Doc. 32 at 10-11).  Despite these criticisms, Tuite recommended Becker in December 2007 for the position of "After School Intervention/As Needed."  (Doc. 39-18 at 1).

During the 2008-2009 school year, Becker worked under the one year limited contracted offered by the School Board.  Additionally, Becker was given a supplemental contract to serve as the "Elementary Grade Level Chair" for the fourth grade.  Also during the 2008-2009 school year, Tuite "departmentalized" the fourth grade, purportedly to limit students' exposure to Becker.  As explained by Tuite:

> So that Mr. Becker's less-than-satisfactory techniques and tones would affect fewer students, and play to his strength (social studies), I departmentalized fourth grade classes for 2008-09.  Although I generally believe fourth grade is too young for such departmentalization, I chose that configuration so other teachers would be responsible for the core areas of instruction of reading and math, and so most children would only have Mr. Becker for 50 minutes a day for social studies instruction instead of all day.

(Doc. 32-3 at ¶14).

5

In November 2008, Tuite conducted Becker's first post-departmentalization evaluation, which generally yielded positive comments and indicated a great deal of improvement over the previous year's evaluations.  Becker's second evaluation on February 11, 2009, however, reflected a poor performance, echoed Tuite's past criticisms, and called for a great deal of improvement.[1] Notably, the February 11 evaluation was conducted one week after the death of a fourth grade student, and Becker later submitted a rebuttal to the evaluation stressing this fact, and asserting that Tuite's criticisms were "not reflective of [Becker's] overall teaching performance."  (Doc. 39-18 at 3).

After the February 11, 2009 evaluation, Tuite committed to conduct "[a] minimum of one [evaluation] weekly until the end of March, 2009," in order to "ensure [Becker's] success."  (Doc. 39-7 at 4).  Tuite did not actually evaluate Becker every week through March, but did conduct evaluations on February 20, February 24, and March 5.  The February 20 evaluation was conducted while Becker was teaching a math skills "intervention," and generally yielded negative results.  Noting that he usually teaches social studies, not math, Becker requested a "comparative learning observation," which Tuite conducted for the February 24 evaluation, and which yielded mostly positive comments.  The March 5 evaluation also yielded positive comments from Tuite.  Additionally, Tuite stated that throughout these evaluations, "Mr. Becker appeared resistant to my directions and suggestions.  During our conferences about his teaching performance, he often

---

[1] The Court references this evaluation as the "February 11" evaluation.  The Court notes, however, that the evaluation form is dated February 19, 2009, (Doc. 32-15), and Becker characterizes February 19 as "the actual conference date."  (Doc. 43 at 14).  Despite this, Becker's later rebuttal email and a formal grievance indicate the evaluation occurred Wednesday February, 11 2009, (Doc. 39-18 at 3; Doc. 39-13 at 4), as does Elmwood's brief.  (Doc. 32 at 11).

asked: 'Are you done yet?' and 'Is that all?' rather than engaging in any discussion about improving his teaching performance."  (Doc. 32 at 12; Doc. 32-3 at ¶17).

On March 17, 2009–six days after Becker submitted his rebuttal to the February 11 evaluation–Becker filed a formal grievance requesting that the February 11 evaluation "be declared invalid and removed from [Becker's] personnel file."  (Doc. 39-13 at 4).

On March 31, 2009, Tuite gave Becker a Plan of Action ("POA") that detailed specific "Expectations [and] Recommendations for Remediation," all of which tended to mirror the criticisms contained in Tuite's prior evaluations.  (Doc. 39-13 at 1-2).  Also on March 31, Tuite gave Becker a memorandum stating her intention to recommend to Pritts that Becker's contract not be renewed.  (Doc. 39-13 at 3).  Pritts in-turn recommended to the School Board that Becker's contract not be renewed, citing Tuite's recommendation, as well as problems in Becker's evaluations and problems with Becker's behavior and professionalism.

On April 8, 2009 Becker requested a meeting with Pritts and Tuite to discuss their non-renewal recommendation.  Also on April 8, the Ohio Education Association ("OEA") issued a letter to Tuite and Pritts requesting that they "Cease and Desist on the non-renewal of Stephen Becker until the grievance procedures have been completed."  (Doc. 39-23 at 2).  The OEA's request was denied, but on April 16, 2009 Pritts and Tuite sent Becker a memorandum titled "Statement describing the circumstances leading to the recommendation of non-renewal of Steve Becker."  (Doc. 39-14).

On April 20, 2009, Pritts told Becker that if he did not tender his resignation by 3:00p.m. that afternoon, the School Board would take-up Pritts' non-renewal recommendation at the School Board meeting that night.  Becker claims he previously planned to attend that evening's School

Board meeting so he could pursue his formal grievance.  After receiving the 3:00p.m. deadline, however, Becker felt he had no choice but to resign, believing his future employment prospects to be better if he resigned.  Thus, before the Board could act on Becker's contract, he resigned on April 20, 2009, effective at the end of his 2008-2009 contract.  In conjunction with his resignation, Becker signed a negotiated separation agreement, the terms of which included Elmwood's agreement to remove all references to Becker's paid leave of absence and potential non-renewal, Elmwood's agreement to provide neutral references, and Elmwood's agreement not to contest any unemployment decisions made by the Ohio Department of Job and Family Services.  It is not clear from the record when Becker and Elmwood negotiated the separation agreement.

Becker filed the instant action on November 1, 2010, alleging gender discrimination, disability discrimination, and retaliation.  Elmwood moved for summary judgment on September 23, 2011.  Becker responded on October 24, 2011, and Elmwood replied on November 3, 2011.

## II.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential

elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

9

*Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Discussion

Becker alleges gender discrimination, disability discrimination, and retaliation in violation of both federal law and Ohio law.  At the outset, the Court notes that it looks to federal law when analyzing Becker's Ohio law claims.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (gender discrimination); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 413, 418 (6th Cir. 2004) (disability discrimination); *Lockett v. Marsh USA, Inc.*, 354 Fed. Appx. 984, at *997 (6th Cir. 2009) (retaliation).

Becker may establish his claims either by introducing direct evidence, or by introducing circumstantial evidence that satisfies the familiar *McDonnell-Douglas* burden shifting analysis. *See Mitchell*, 964 F.2d at 582 (gender discrimination); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) (disability discrimination); *Lockett*, 354 Fed. Appx. 984, at *997 (retaliation).  Because Becker has not proffered any direct evidence, the *McDonnell-Douglas* analysis applies.  Under that framework, Becker has the initial burden of establishing a *prima facie* case for each of his claims.  *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Upon doing so, the burden shifts to Elmwood to articulate a legitimate, non-discriminatory reason for its action.  *Id*.  Finally, the

burden shifts back to Becker to show that Elmwood's proffered reason is merely a pretext for unlawful discrimination.  *Id.*

**A.  Gender Discrimination:  *Prima Facie* Case**

The Sixth Circuit has modified the *prima facie* case for instances where, as here, a Title VII plaintiff claims reverse discrimination as a member of a demographic majority.  *Treadwell v. Am. Airlines, Inc.*, 2011 U.S. App. LEXIS 23348, at *4 (6th Cir. Nov. 18, 2011) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)).  To establish a *prima facie* case of reverse gender discrimination Becker must show: (1) background circumstances to support the suspicion that Elmwood is "that unusual employer who discriminates against the majority"; (2) Becker was qualified for the position; (3) Becker suffered an adverse employment action; and (4) Becker was treated differently from similarly situated employees.  *Treadwell*, 2011 U.S. App. LEXIS 23348, at *4 (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603-04 (6th Cir. 2008)).

At the outset, the Court notes that Becker objects to the Sixth Circuit's modified *prima facie* case as unfairly imposing a heightened standard in reverse discrimination cases.  Despite Becker's objections, this Court is bound by Sixth Circuit case law, which recently declined to reexamine the modified *prima facie* case.  *See Highfill v. City of Memphis*, 425 Fed. Appx. 470, at *473 (6th Cir. June 6, 2011).

The Court also notes that the parties do not agree on the precise requirements of the modified *prima facie* case.  Elmwood argues under an older, two-prong articulation.  (Doc. 32 at 16-17) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir. 1994) (stating that a reverse discrimination *prima facie* case requires plaintiff show (1) defendant is unusual employer who discriminates against majority; (2) similarly situated employees were treated

11

differently).  Becker, meanwhile, does not specify which elements are included, but does argue that the "similarly situated" requirement is not applicable in this case, and only applies where the defendant allegedly failed to promote the plaintiff.  (Doc. 43 at 23) (citing *Zambetti v. Cuhahoba Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) ("Under the fourth prong, because this is a failure to promote case, plaintiff must show that the employer treated differently employees who were similarly situated but not members of the protected group.") (internal quotations omitted)).  Notwithstanding these arguments, this Court applies the *prima facie* case as stated above, which was articulated by the Sixth Circuit only one month prior to this Opinion, and which was applied in a case where the plaintiff was terminated.[2]  *See Treadwell*, *supra*, 2011 U.S. App. LEXIS 23348, at *4.

Elmwood does not dispute that Becker was qualified for the position.  Therefore, the Court only examines the remaining three elements.

### 1.  Background Circumstances of Discrimination Against the Majority

Becker makes several unpersuasive arguments to "demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 Fed. Appx. 330, at *339 (6th Cir. 2009) (internal quotations omitted).  First, Becker notes that he was the only male elementary school teacher during the entire time he was employed at Elmwood.  Moreover, Becker contends that Tuite, a female, "in essence was the person who made the employment decision," because she was the only person who ever conducted Becker's teaching evaluations.  (Doc. 43 at 22).

---

[2]

The parties' disagreement as to the appropriate *prima facie* case does not inhibit this Court's analysis, as all of the elements are fully addressed at some point in the parties' briefs.

Alternatively, to the extent Pritts, a male, was involved in the employment decision, Becker asserts–albeit, with no explanation–that Pritts' actions were a result of "the cat's paw theory."  *See Arendale*, 519 F.3d at 604 n.13.  Under that theory, a biased subordinate (Tuite) uses the formal decision maker (Pritts) "as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 485 (10th Cir. 2006).  Additionally, under the "rubber stamp" iteration of the theory, "the decision maker follow[s] the biased recommendation [of a subordinate] without independently investigating the complaint against the employee."  *Id.*  (internal quotations omitted).

Becker's arguments are unavailing.  First, while Becker was the only male elementary school teacher at Elmwood, the majority of Elmwood's administration was male.  *See Kimble v. Intermetro Indus.*, 288 F. Supp. 2d 876, 879-80 (N.D. Ohio 2003) (Carr, J.) (while plaintiff was only male on shift, no evidence of "background circumstances" where management team was comprised mostly of men, and where no evidence suggested internal or external pressure to favor women).  Moreover, the undisputed evidence both demonstrates Pritts' involvement in the non-renewal recommendation, and negates the "cat's paw theory."  Pritts personally met with Becker on more than one occasion, investigated Becker's conduct as it related to Luke Story, and personally called Becker's parents to discuss concerns with Becker's behavior and professionalism.

Becker also argues that he was replaced by a woman, Marsha Grouls, and asserts that this fact sufficiently demonstrates background circumstances under *Zambetti* and *Morris*, *supra*. *Zambetti* and *Morris* held that "a plaintiff can demonstrate background circumstances by showing simply that the employer was a member of the same minority race as the employees he was

promoting." *Morris*, 320 Fed. Appx. at 339-40 (citing *Zambetti*, 314 F.3d at 257).  At the outset, the Court notes that the Sixth Circuit applied this rule to alleged cases of reverse race discrimination, and it is not clear whether the Sixth Circuit intended it to be applied to cases of reverse gender discrimination.  In any event, the rule is inapposite here because the Elmwood administration was majority male.  Thus, it cannot be said that the employer was a member of the same gender as the employees allegedly being favored.  *Morris*, 320 Fed. Appx. at 339-40.

## 2. Adverse Employment Action

The parties strongly dispute whether Becker suffered an adverse employment action. While Becker concedes he resigned from Elmwood prior to the expiration of his one year limited contract, he maintains he was constructively discharged by the circumstances of Tuite and Pritts' non-renewal recommendation.  Specifically, Becker argues that when he was told on April 20 that the School Board would act that night on Tuite and Pritts' non-renewal recommendation unless Becker tendered his resignation by 3:00p.m. the same day, he had no choice but to resign.  If he did not, Becker claims he would "almost surely have his contract non-renewed which would result in a great inability to get another teacher's job."  (Doc. 43 at 24).

The Sixth Circuit defines "adverse employment action" as a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct."  *Kocis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996); *accord James v. Goodyear Tire & Rubber Co.*, 354 Fed. Appx. 246, at *248 (6th Cir. 2009).  Moreover, "[a]n employer is liable for constructive discharge when it coerces an employee to leave by creating 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *McKelvey v. Sec'y of United States Army*, 2011 U.S. App. LEXIS 24848, at *6-*7 (6th Cir. Dec. 14, 2011) (quoting *Penn. State*

*Police v. Suders*, 542 U.S. 129, 147 (2004)).  Thus, whether Becker suffered an adverse

employment action turns on whether the circumstances leading to Becker's resignation changed

the terms and conditions of his employment such that a reasonable person would have felt

compelled to resign.

Without explanation, Becker relies on *Kohmescher v. Kroger Co.*, 61 Ohio St. 3d 501

(Ohio 1991), and *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326 (7th Cir. 2002).  In

*Kohmescher*, the Ohio Supreme Court found a genuine issue of material fact existed as to whether

the plaintiff voluntarily retired or whether he was constructively discharged because the plaintiff

"was given such a short period of time to decide whether he would accept a transfer to an

undisclosed position in an unknown location in California or opt for retirement with enhanced

benefits." *Id*. at 506.  In *University of Chicago Hospitals*, the Seventh Circuit found that a

constructive discharge occurred where both the plaintiff's employer, as well as a recently

terminated colleague, effectively told the plaintiff she would be terminated.  *Id*. at 332.

Elmwood relies on *Stevenson v. Cuyahogo County Cmty. Coll.*, 2003 Ohio App. LEXIS

2050 (Ct. App. May 1, 2003).  In that case, the plaintiff retired after defendant's Human

Resources department issued a letter stating that the plaintiff's employer would not be renewing

her one year contract.  *Id*. at ¶4.  Despite this, the court held that the plaintiff was not

constructively discharged because she retired with enhanced benefits for which she negotiated and

to which she was not otherwise entitled.  *Id*. at ¶¶18-20.

In this case, Becker was not constructively discharged.  The reason Becker resigned–and

the gravamen of Becker's constructive discharge argument–is his assertion that a non-renewal

would have made it extremely difficult to find future employment.  Becker offers no authority,

15

however, to show why a perceived impact on future employment prospects amounts to a materially adverse change in the terms and conditions of his employment at Elmwood. *See Kocis*, 97 F.3d at 885. This is especially true when considering the fact that Becker tendered his resignation after negotiating a severance agreement that included benefits to which he was not otherwise entitled. *See Stevenson*, 2003 Ohio App. LEXIS 2050. Thus, the Court does not believe that Becker was constructively discharged, and he therefore did not suffer an adverse employment action.

### 3. Similarly Situated Employees

Becker makes numerous arguments in an attempt to demonstrate that similarly situated female employees were treated differently:

> The other teachers, all female, were treated more favorably than Becker. Examples include as follows: (1) Many teachers at Elmwood yell at students, including the fourth grade teacher across the hall from Becker, but nothing happened to them. (2) Grouls was placed on a Plan of Action at the same time that she received her evaluation, while Becker had to wait weeks for his Plan of Action after he received his evaluation and on the same day that he did receive it Tuite made a formal recommendation for non-renewal of his contract. (3) Grouls received help from a consultant after her evaluation but Becker was not provided assistance from a consultant after his evaluation. (4) Becker was the only elementary school teacher placed on a Plan of Action during the 2008-2009 school year. (5) Becker was the only elementary school teacher who Tuite recommended non-renewal of his contract for the 2008-2009 school year. (6) Becker was the only fourth-grade teacher to be evaluated within days of the death of a fourth-grader who attended the same school and whose death deeply affected the students and teachers.

(Doc. 43 a 24). Becker's arguments are not sufficient. The Sixth Circuit has held that for other employees to be considered similarly situated, a "plaintiff must show that the 'comparables' are similarly situated in all respects." *Mitchell*, 964 F.2d at 583. While Becker makes arguments regarding the treatment of female teachers who yelled at students or who had poor performance evaluations, he fails to offer any evidence of employees who had behavioral and professionalism

issues of comparable seriousness. *See Id*. (citing *Linear v. Safeway Grocery*, 843 F.2d 298 (8th

Cir. 1988) (plaintiff must show "that the other employee's acts were of comparable seriousness to

his own")). Specifically, Becker does not point to female teachers who had complaints of

harassing telephone calls, who caused the school to be placed on lockdown, or who were placed

on paid administrative leave over behavioral concerns. Moreover, this Court is not persuaded by

Becker's argument that the behavioral and professionalism issues from 2006-2007 are too remote

in time to be relevant. The record reflects a continuity in Elmwood's decisions related to Becker's

continued employment. This is illustrated by the decision to place Becker on administrative leave

in 2007, the decision to offer him a one year limited contract instead of a continuing contract for

the 2008-2009 school year, and Tuite and Pritts' non-renewal recommendation in 2009. The

Court cannot simply isolate the record to the months immediately preceding Becker's resignation.

Thus, Becker cannot demonstrate that similarly situated female employees were treated

differently.

**B. Disability Discrimination:** *Prima Facie* **Case**

To establish a *prima facie* case of disability discrimination under the Americans with

Disabilities Act ("ADA"),

> a plaintiff must show that 1) he or she is disabled, 2) otherwise qualified for the
> position, with or without reasonable accommodation; 3) suffered an adverse
> employment decision; 4) the employer knew or had reason to know of the
> plaintiff's disability; and 5) the position remained open while the employer sought
> other applicants or the disabled individual was replaced.[3]

---

[3]

The parties argue Becker's disability discrimination claims under the three-element "*Mahon*
formulation" of the *prima facie* case. *See Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002)
(plaintiff must show "(1) that she or he is an individual with a disability; (2) who was otherwise
qualified to perform a job's requirements, with or without reasonable accommodation, and (3)
who was discharged solely by reason of the disability."). The Sixth Circuit in *Whitfield*, *supra*,

*Whitfield*, 639 F.3d at 258-59 (quoting *Macy v. Hopkins County. Sch. Bd. Of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

While Elmwood does not dispute Becker's qualifications or Becker's replacement, Becker is unable to establish a *prima facie* case of disability discrimination because, as discussed *supra*, he did not suffer an adverse employment action. Despite this, a discussion of whether Becker was disabled as defined by the ADA is warranted.

The ADA's definition of disability includes instances where an employer perceives that an employee is disabled. 42 U.S.C. § 12102(3). Moreover, while the ADA previously required the perceived disability to substantially limit a major life activity, the ADA Amendments Act of 2008, P.L. 110-325, removed this hurdle. The ADA now includes perceived disabilities "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).[4]

Notably, Elmwood's summary judgment motion argues under the pre-amendment version of the ADA, and relies on *Hughes v. Madison Local Sch. Dist.*, 2006 U.S. Dist. LEXIS 28922 (N.D. Ohio May 11, 2006) (Gaughan, J.), for the proposition that Becker cannot show Elmwood

---

expressly rejected the "*Mahon* formulation" in favor of the above-stated five-element "*Monette* formulation." *See Whitfield*, 639 F.3d at 259 ("*Monette* states the proper test . . . . [T]he three-element *Mahon* formulation of a *prima facie* case makes little sense, as its third element . . . requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts . . . .").

That the parties do not argue under the "*Monette* formulation" does not hinder the Court's analysis. The parties argue any additional or different elements elsewhere in their briefs, and in any event, Becker cannot create a factual dispute as to pretext.

[4]

Whether the ADA's amended definition of a perceived disability impacts the applicability of federal law to Ohio law claims based on a perceived disability is not clear. It is not necessary to reach this issue, however, as Becker cannot demonstrate the adverse employment action prong of the *prima facie* case.

perceived him to have a disability *that limits a major life activity*.  Elmwood's reply brief does acknowledge the ADA's current standard, yet it doubles-down in reliance on *Hughes*, arguing that factual similarities should yield the same result as in that case.  In any event, Elmwood argues that while it had "generic but legitimate concerns about Becker's health and well-being," it did not perceive Becker to be disabled.  (Doc. 44 at 12).  As evidence, Elmwood cites Tuite and Pritts' affidavits, which both claim they did not perceive Becker to be disabled.

This Court is not persuaded by Elmwood's arguments.  First, notwithstanding any factual similarities, the *Hughes* court relied on the pre-amendment version of the ADA.  *See Hughes*, 2006 U.S. Dist. LEXIS 28922, at *17 ("Even assuming plaintiff clearly articulated a limitation, plaintiff fails to present any evidence indicating that defendant treated the impairment as substantially limiting a major life activity.").  Moreover, despite Tuite and Pritts' affidavits, there is sufficient evidence to create a factual dispute as to whether Elmwood perceived Becker as having a disability.  This evidence includes: allegations that Becker told Tuite he has OCD; notes from Becker's 2007 reinstatement meeting reflecting that Pritts asked Becker for information about physical or mental issues, reflecting that Pritts told Becker his relationship with Luke Story was obsessive compulsive, and reflecting that Elmwood "has asked for a medical evaluation from a third party doctor because of [its] concerns [about appropriate boundaries, and about the safety and well being of students]," (Doc. 39-17); evidence that Pritts called Becker's parents to discuss Becker's well-being; allegations that either Pritts or Tuite suggested Becker be seen by a psychiatrist; allegations that the Elementary School Secretary knew of Becker's OCD and told him to stay on his medications.

## C.  Retaliation: *Prima Facie* Case

19

To establish a *prima facie* case of retaliation, Becker must show that:

(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Arendale*, 519 F.3d at 606.  Elmwood does not dispute that Becker engaged in protected activity by filing complaints with the EEOC and OCRC, nor does Elmwood dispute that it was aware of Becker's complaints.  As discussed above, Elmwood does contend–and this Court agrees–that Becker did not suffer an adverse employment action.

Even if Becker established an adverse employment action, he fails to create a sufficient factual dispute regarding a causal connection between the adverse action and his EEOC and OCRC complaints.  Becker cites Pritts' reference to the OCRC complaints during the August 16, 2007 reinstatement meeting.  Becker's affidavit and the meeting notes differ as to the precise language used, but Pritts substantially stated:  "and now I get this civil rights charge."  (Doc. 43 at 9; Doc. 39-17 at 2).  Becker's affidavit also contends Pritts changed to a more firm tone of voice when making this comment.  *Id*.  Becker attempts to bolster the comment's probative value by declaring that "[Pritts] was obviously displeased that Becker filed a charge of discrimination and it can be reasonably concluded, based on his reaction to the first charge, that he became even more upset after he learned Becker filed a second charge of discrimination."  (Doc. 43 at 29).  Becker further claims that "Pritts was focused on these charges.  He even showed them–both of them–to Tuite while Becker was still employed by Elmwood."  (Doc. 43 at 29-30).

Becker's argument is unavailing.  First, Becker fails to explain how Pritts' discussion of OCRC charges in the context of an administrative reinstatement meeting demonstrates a causal connection between the charges and a putative adverse employment action, *particularly when*

*Pritts recommended a one-year contract extension after making the comment.*  Moreover, Becker offers no evidence to support his claim that Pritts was even more upset with Becker's second discrimination charge, and Becker's theory that Pritts' had a sinister "focus on the charges" does not alter this analysis.  This Court does not believe that a rational jury could find that a Superintendent's decision to inform a principal that formal discrimination charges were filed against her school constitutes evidence of such a poisonous obsession that the charges became an impetus for retaliation.

Thus, the Court finds that Becker is unable to satisfy the third and fourth elements of a *prima facie* case for retaliation.

**D.  Legitimate Reason & Pretext**

Even if Becker can establish a *prima facie* case for any of his claims, Elmwood has proffered legitimate, non-discriminatory reasons for its action, and Becker is unable to demonstrate pretext.

The legitimate, non-discriminatory reasons proffered by Elmwood include the various performance-related criticisms from Becker's in-class evaluations, Becker's resistance to instruction, and Becker's professionalism and behavioral issues.  Becker makes several arguments in an attempt to demonstrate pretext.  First, Becker apparently argues that Tuite's stated reasons for departmentalizing the fourth grade–namely, her desire to minimize Becker's need to teach anything other than social studies–shows evidence of pretext because departmentalization of the fourth grade continued after Becker's resignation.  This argument is unpersuasive.  Becker neither argues that departmentalization was an adverse employment action, nor does he explain how

21

departmentalization was otherwise pretextual.  Becker simply seems to assert that the apparent

inconsistency must be evidence of pretext, though he does not explain why.

Second, Becker asserts that criticisms of his in-class performance were pretextual.

Specifically, Becker cites his February 2008 and November 2008 performance evaluations,

characterizing them as "a continuing pattern of improvement."  Becker also notes that he was

recommended for the After School Intervention position in late 2007 and that he held the

Elementary Grade Level Chair position during the 2008-2009 school year.  Upon painting a

favorable picture of his performance, Becker claims that

> Tuite did an about-face on Becker based on a single 30-60 minute observation of
> Becker that was conducted at a time when Becker was reviewing math skills, a subject
> that he had not taught all year, at a time when th students and fourth grade teachers
> were still grieving the death of a fourth grade student.

(Doc. 43 at 31). Becker also stresses that this evaluation was the first where Tuite marked

"Unfavorable" in response to "Recommendations for contract consideration," and notes that Tuite

only completed three follow-up evaluations after initially intending to evaluate Becker every week

through the end of March 2009.

Becker's argument is not sufficient to demonstrate a factual dispute that Elmwood's

performance criticisms are pretextual.  Becker's characterization of his February and November

2008 evaluations ignore the performance criticisms contained therein, and also fails to account for

the fact that his October 2007 evaluation was not favorable.  Moreover, while Tuite did not

evaluate Becker every week from the end of February through the end of March, she did conduct

three performance evaluations during that period, which produced mixed results.  Thus, as argued

by Elmwood, the record reflects an inconsistent pattern of performance on the part of Becker, and

simply does not support the claim that Tuite did an about face during a single, ill-timed evaluation.

Third, Becker argues that the professionalism and behavioral issues that occurred during the 2006-2007 school year are pretextual because they are too remote in time to be relevant.  As noted above, however, the Court cannot simply isolate the record to the months immediately preceding Becker's resignation and ignore legitimate issues that occurred in 2006-2007, including allegations of harassing telephone calls and an erratic mid-day departure that resulted in a school lockdown.  Further, when viewed in context, the events in 2006-2007 were not isolated, but were part of an ongoing assessment of Becker's employment, which included the decision to place Becker on administrative leave in 2007, the decision to offer him a one year limited contract instead of a continuing contract for the 2008-2009 school year, and the decision by Tuite and Pritts to recommend non-renewal in 2009.

Finally, Becker claims that Tuite's failure to provide him with a formal POA until the day of her non-renewal recommendation constitutes evidence of pretext.  Tuite explained the delay by stating that she did not know a POA was a separate document and/or meeting until she provided Becker with his POA in 2009.  (Doc. 30 at 50:12-24).  Becker claims Tuite's explanation is untrue, however, citing an April 2008 evaluation and March 2008 evaluation that Tuite conducted for Mary Ellen Dierksheide, another Elmwood teacher.  In those evaluations, Tuite wrote that certain items "need to be placed into an action plan for successful implementation and completion."  (Doc. 43-3 at 12, 16).  Despite Becker's claims, however, Dierksheide's affidavit actually corroborate's Tuite's claim of ignorance as true, as Dierksheide claimed "I was never given an action plan [from Tuite]." (Doc. 43-3 at ¶4).  Thus, Becker is unable to demonstrate pretext in this regard, or in any other, and Becker has therefore failed to satisfy the necessary burdens to maintain a discrimination suit.

**IV.  Conclusion**

For the reasons stated herein, Elmwood's motion for summary judgment (Doc. 32) is granted.

IT IS SO ORDERED.

                                                    _s/ *David A. Katz*_____

                                                    DAVID A. KATZ

                                                    U. S. DISTRICT JUDGE